**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **GRAY W. HEMPHILL, III,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:24-cv-00866** |
| | ) | **Judge Aleta A. Trauger** |
| **HUB GROUP, INC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM**

Before the court is the Motion for Summary Judgment (Doc. No. 34) filed by defendant HUB Group, Inc. ("HUB"), seeking summary judgment on all of plaintiff Gray Hemphill's claims against it for employment discrimination under 42 U.S.C. § 1981 and the Tennessee Human Rights Act ("THRA"), violation of the minimum wage and overtime provisions of the Fair Labor Standards Act ("FLSA"), retaliation in violation of all three statutory schemes, and unjust enrichment under Tennessee law. (*See* Compl., Doc. No. 1.) For the reasons set forth herein, the motion will be granted.

## I. LEGAL STANDARD – RULE 56

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

## II. PROCEDURAL HISTORY

Hemphill initiated this lawsuit in the Davidson County Circuit Court, and HUB removed it to this court in July 2024. Following the close of discovery, HUB moved for summary judgment on all claims set forth in the Complaint. In support of its motion, HUB filed a Memorandum of Law (Doc. No. 36), Statement of Undisputed Material Facts ("SUMF") (Doc. No. 35), and the

factual material cited in support of its motion. Hemphill filed a Response in Opposition to the Motion for Summary Judgment (Doc. No. 39), Response to the SUMF ("PRSUMF") (Doc. No. 41), his own Statement of Additional Material Facts ("SAF") (Doc. No. 40), and additional or duplicative evidentiary material. The defendant responded to the SAF ("DRSAF") (Doc. No. 43) and filed a Reply (Doc. No. 42).[1]

In his Response, Hemphill expressly concedes that the factual record as developed in discovery is insufficient to support his claims for substantive violations of 42 U.S.C. § 1981, the THRA, or the FLSA. (Doc. No. 39 at 1–2 n.1.) He nonetheless maintains that material factual disputes preclude summary judgment on his claims for retaliation in violation of all three statutes, as well as on his unjust enrichment claim. The factual recitation below, therefore, focuses on the facts relevant to these remaining claims.

The facts set forth herein for which no citation is provided are drawn directly from the PRSUMF and are undisputed for purposes of summary judgment. The facts are undisputed or viewed in the light most favorable to the plaintiff, unless otherwise indicated.

## III. FACTS

### A. Background

HUB is a transportation and logistics management company that specializes in providing comprehensive supply chain solutions. It employs truck drivers to deliver products.

[1] Prior to May 2025, the court's Local Rules authorized a party responding to a summary judgment motion to include with its response to the movant's statement of undisputed material facts a "concise statement of additional facts" that the non-movant believes are both material and disputed. L.R. 56.01(c) (Jan. 24, 2020). As amended in May 2025, the Local Rules no longer authorize such an additional statement of disputed facts. *See* L.R. 56.01(e) (May 15, 2025). The defendant, although it responded to the SAF, objected on the grounds that it is prohibited by the Local Rules. The court has reviewed the SAF and finds that, aside from the fact that it is not permitted by the Local Rules, most of the statements in the SAF are either redundant of those in the SUMF, not material to the remaining claims, or not supported by the cited material.

HUB Group utilizes Lytx DriveCam ("Lytx"), a "VER" (Video Event Recording) technology that assesses and captures driver behaviors to improve driver safety and provide drivers with opportunities to improve their driving skills. Lytx captures "triggered events" to identify driving behaviors that increase risk so that drivers can self-correct. Lytx reviews the "triggered events" captured by the DriveCam and then sends the video to the terminal and/or driver manager for review.

Triggered events include such things as rolling stops, eyes off the road, seat belts not engaged, and driver distraction caused by such activities as eating, drinking, and smoking. When a driver engages in certain unsafe behaviors, like distracted driving, the Lytx system emits audible alerts, allowing drivers the opportunity to self-correct with no event being recorded. If, however, the driver fails to correct him or herself after the second audible alert, the event will be recorded and sent to management for secondary review.

HUB Group uses Idelic to manage the safety of its fleet. Idelic gathers data from various sources of information, including a driver's motor vehicle record, accident or injury reports, and Lytx. Using this information, Idelic generates a Watch List risk score, between 1 and 100, with a score of 1 being the best and 100 the worst. Citations, "dirty" roadside inspections, and Lytx triggered events can increase a driver's Watch List risk score. HUB will place a driver on a Personal Development Plan ("PDP") when his or her Idelic Watch List risk score exceeds 76. A driver can only be assigned two PDPs within a rolling 12-month period. If a driver's Watch List risk score requires a third PDP within the 12-month period, the driver may be subject to termination.

When a driver is placed on a PDP, Idelic assigns tasks for the driver and the driver's manager to complete over a four-week period to address the unsafe behavior that is increasing the

driver's Watch List score. The expectation is that over the course of the PDP, the driver's Watch List risk score will decrease without further incident.

HUB also provides all new drivers a copy of and access to the HUB Group Company Driver Handbook ("Handbook"). The Handbook provides a policy concerning driver disqualifications, and drivers are provided with examples of safety violations that constitute driver disqualifications, or instances in which a driver may be terminated. The Handbook states that "drivers may be terminated" for, among other things, "failure to report an accident." (Doc. No. 35-1 at 11–12.) The term "accident" is defined by the Handbook as "[a]ny event involving a vehicle striking an object not connected to the vehicle, excluding animals and normal road debris, regardless of damage." (*Id.* at 17.) The term "incident" is defined to include "a fixed object accident resulting in less than $1,000 in physical damage cost." (*Id.* at 18.) "A driver who has a preventable accident or incident is subject to corrective action, up to and including termination of employment." (*Id.* at 15.)

**B. Hemphill's Employment and Termination**

HUB employed Hemphill as a truck driver from February 2023 until his termination on October 5, 2023. His direct supervisor from February through May 2023 was Denise Smith. His direct supervisor from May 2023 until his termination was Clevon Ford. At all relevant times, Ty Wright was the Terminal Manager for HUB's Nashville Terminal and was Hemphill's second level supervisor. Smith, Ford, Wright, and Hemphill are all African American.

Around May 1, 2023, Hemphill was placed on his first PDP. He completed the tasks assigned by Idelic and thus completed the PDP. In August 2023, Hemphill's Watch List score hit the threshold again, and he was placed on a second PDP when he returned from medical leave on August 28, 2023. On September 21, 2023, Hemphill hit a parked trailer on a customer's property. (Hemphill Dep. 148–49.) Lytx captured the impact and alerted HUB management to the triggered event. Wright subsequently called Hemphill and asked him about the incident. Hemphill admitted

to hitting the trailer after Wright questioned him. Although Hemphill acknowledges that his unit struck the trailer, he characterizes the contact with the trailer as a "rub." (Hemphill Dep. 149.) According to the plaintiff, this "rub" did not result in damage. (*See id.* at 153, 155.) However, Hemphill knew HUB's policy required him, as a driver, to report any accident. Hemphill has admitted that he struck an object with his trailer and failed to report it in violation of HUB Group policy.

Ed Foster is the Southeast Regional Safety Manager who covers the Nashville Terminal where Hemphill's employment was based. Foster reviewed the incident and recommended to Human Resources that Hemphill be terminated for failing to report an accident in violation of HUB policy. At the relevant time, the Human Resources Manager overseeing the Nashville Terminal was Tiara Adams ("Adams"), who received Foster's termination recommendation. After consulting with her direct supervisor, Director of Human Resources Laura O'Neal, Adams approved Hemphill's termination on or about October 5, 2023. On the same day, Wright called Hemphill to inform him of the decision to separate his employment. Wright memorialized their conversation in a follow-up email, explaining, "As a result of the investigation into the incident/accident that occurred on Thursday, September 21, 2023, on a customer's property, the decision has been made to terminate your employment with Hub Group Trucking, effective immediately, due to failure to report an incident/accident." (Doc. No. 35-15 at 2.)

The Disciplinary Action Form documenting the plaintiff's termination states that the reason for the termination was Hemphill's accident and failure to report it. (Doc. No. 40-5.) Under "Action Plan for Improvement" on the same form, it states, "Based on the severity of the offense, and the fact that he did not report it, along with the driver's current watch list score of 62 (this is

before the collision), and that he is currently on his second PDP, the decision has been made to terminate Mr. Hemphill's employment with Hub Group Trucking, effective immediately." (*Id.*)

### C. Section 1981 and THRA Retaliation Claims

Asked during his deposition about his complaints about the Lytx system, Hemphill explained that he is not alleging in this lawsuit that Lytx is intentionally discriminatory, but his "assumption" is that the system was not designed to be as "accurate" for "people with dark skin during dark hours" as it is for people with "white skin." (Hemphill Dep. 206.) He believed it was "possible that during programming, . . . it may have affected white drivers differently than black drivers." (*Id.* at 206.) Nothing in his deposition testimony suggests that he complained to his HUB supervisors that he believed the system was discriminating against Black drivers. Asked about meetings with HUB management about Lytx, the plaintiff testified that he and many other drivers, too, were upset with the system because it "dinged" them for eating and drinking while driving. (*Id.* at 88–89.) They had a Terminal meeting about the issue, when "a vice president came down to Nashville to discuss" the complaints, though Hemphill could not recall which drivers attended the meeting. (*Id.* at 97–98.) He also testified about a meeting between himself and his supervisors, Smith and Wright. It is unclear when this meeting occurred. Asked what they discussed at this meeting, Hemphill stated that they talked "[a]bout the use of drinking water and coffee and snacks triggering the AI system," and he complained that he "felt the Lytx in-camera system was dinging [him] for drinking coffee," or drinking generally, and eating. (*Id.* at 107–08.) He also testified that Smith and Wright "acknowledged" that the system was "dinging" him for eating and drinking and that Wright, in fact, had "instructed people to stop drinking, to quit agitating the AI system," which did not go over well with the drivers. (*Id.* at 108.)

After being asked what they talked about at the meeting with his supervisors, Hemphill did not testify that race, or the possibility that the Lytx system was treating Black and White drivers

differently, came up during that or any other meeting. He vaguely recalled having a conversation with another Black driver "about the sensitivity of the camera." (*Id.* at 98.)

In response to HUB's Motion for Summary Judgment, Hemphill filed a Declaration in which he now states:

> 3. Upon receiving my first [PDP] in May 2023, I expressed concerns to Ty Wright and Ed Foster about the fact that the Lytx camera system was constantly "dinging," or indicating potential unsafe behavior, any time I drank coffee or water prior to sunrise. This prior communication is reflected in an email exchange between myself and Mr. Wright . . . attached herein as Exhibit A.
>
> . . . .
>
> 8. Accordingly, I complained to Ty Wright and Ed Foster that I was concerned the artificial intelligence in the Lytx camera system may be inadvertently causing racial discrepancies in Idelic Warning List point accruals. Some of the contents of these conversations are reflected in Exhibit A.
>
> 9. Ty Wright referred to this complaint as me being argumentative and not accepting responsibility for safety. This is reflected in Exhibit A.

(Doc. No. 40-2, Hemphill Decl. ¶¶ 3, 8–9.)

Exhibit A, to which the plaintiff refers, is a lengthy email exchange between him and Ty Wright, some of which emails are also copied to Ed Foster, that took place from June 14, 2023 through June 16, 2023. (Doc. No. 40-7.) In the first email, from Wright to Hemphill, Wright notified Hemphill, "You are approaching your second [PDP], based on your driving behaviors." (*Id.* at 6.) He stated that they had addressed and coached Hemphill's "unsafe actions" but that he had not changed the way he drove and, most recently, had run a stop sign. (*Id.*) Wright emphasized that such conduct was "unacceptable and will not be tolerated." (*Id.*) Hemphill responded with a lengthy email, referencing his "first [meeting] on this issue," during which he "shared with" Smith and Wright his opinion—and they "both agreed" with him—"that drinking coffee and water or snacks triggers the A.I. system," *i.e.*, Lytx. (*Id.* at 5.) He attributed his accumulation of points to that problem rather than unsafe driving behavior. (*Id.*) He articulated numerous other complaints

and expressed his belief that Wright was "building a case against [him]," but he did not express any complaint that the Lytx system is unfairly biased based on race or color, nor did he refer to a past complaint that the system was discriminatory. (*See id.*) This is apparently the May 2023 meeting to which he refers in his Declaration (Hemphill Decl. ¶ 3), but it was with Smith and Wright, not Foster and Wright, as he also confirmed in his deposition (Hemphill Dep. 107).

Wright responded with his own lengthy email, addressing and disputing each of Hemphill's contentions. His response likewise did not mention race. (*Id.* at 4.) Hemphill responded again, still on June 14, accusing Wright of "suspending" him for three days after their meeting that day because he was "upset" with Hemphill. (*Id.* at 3.) This email was copied to Foster. Wright responded:

> We are sitting drivers to improve our loads per driver per day. It is your turn to sit, and that decision was made to do it now because of your driving behavior. It is a good time to take a break and reflect on our discussion. Safety is our number one priority, so yes, when someone is clearly, blatantly, not following the law and company policy, and wants to argue about it, there will be discussions and consequences.
>
> Sitting drivers is never based on emotions. We follow the directives of Hub leadership. You will be back to your normal schedule on Sunday, June 18. I fully expect no more issues going forward.

(*Id.*)

Hemphill responded with yet another lengthy email to "recap" their meeting, enumerating numerous complaints and again copying Foster. He mentioned ethnicity in this one, stating that he felt that Wright's referring to him as "bro" "was not only in a negative context but was an inappropriate ethnic slur for someone my age and highly offensive and unprofessional." (*Id.* at 2.) Wright responded once more, copying Foster, thanking Hemphill for his "feedback and honest communication" and declining to continue to go "back and forth in this manner." (*Id.* at 1.)

### D. FLSA Retaliation Claim

Hemphill submitted numerous complaints about and to Smith about Smith's lack of professionalism. He also complained to her about her failure to correctly report and pay him for "detention" time on May 2, 3, 4, and 5, 2023. (*See* Doc. No. 40-8.) However, Hemphill admitted during his deposition that he cannot identify a single week in which he was not eventually paid for all hours worked. (Hemphill Dep. 168.) Hemphill never complained to management that he was not being paid minimum wage, and he did not recall ever making a complaint about not receiving overtime pay. (Hemphill Dep. 166.)

### E. Unjust Enrichment Claim

Hemphill believes he may not have been paid for all hours worked, but he admitted during his deposition that he cannot identify any week in which he was not paid for all hours worked. (Hemphill Dep. 168.)

## IV. ANALYSIS

### A. Retaliation Under § 1981 and the THRA

Retaliation claims under § 1981 and the THRA are subject to the same legal standards, and, when they depend on indirect evidence, they are both analyzed at the summary judgment stage under the familiar *McDonnell Douglas* burden-shifting framework. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)); *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001). Thus, to survive summary judgment on retaliation claims, a plaintiff must first establish a *prima facie* case, which requires evidence sufficient to prove "(1) that the employee engaged in protected activity; (2) that the employer knew about the employee's protected activity; (3) that the employer subsequently took a materially adverse action against the employee; and (4) a causal connection between the employee's protected activity and the resulting adverse action." *Ferguson v. Middle Tenn. State*

*Univ.*, 451 S.W.3d 375, 382 (Tenn. 2014); *see also Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018) (enumerating same elements). If a plaintiff succeeds in making out these elements, "the burden shifts to the employer to proffer a legitimate, nondiscriminatory [or nonretaliatory] reason for its decision." *Rogers*, 897 F.3d at 772 (alteration in original) (citation omitted). If the employer does so, "the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual." *Id.* (citation omitted).

HUB argues that the plaintiff cannot show that he engaged in protected activity, for purposes of his retaliation claims under § 1981 and the THRA, because he cannot show that he ever complained to HUB's management that the Lytx system was inherently biased against Black drivers. (Doc. No. 36 at 18.) It further argues that, even if Hemphill could make such a showing, HUB had legitimate, non-retaliatory reasons for any adverse employment decisions to which the plaintiff might point, and Hemphill cannot show that its reasons are pretext for retaliation.

The plaintiff argues in his Response that he has "ample evidence" of engaging in protected activity, pointing specifically to his complaints about the Lytx system (Doc. No. 39 at 9, 10.) Most of the factual assertions set forth in his Response are misleading or simply not supported by the record. For instance, he claims that he "complained to his direct Hub Group supervisors that, as a black man, Lytx was unfairly 'dinging' him and increasing his Idelic Watch List risk score when he was eating or drinking while driving in the early mornings hours, whereas his white coworkers reported the Lytx system did not indicate violations for them." (*Id.* at 10.) Contrary to his suggestion in his Response, Hemphill testified that two White coworkers reported *to him* that the system was not "dinging" them for drinking coffee early in the morning, though one reported that the system "dinged" him for eating a sandwich around 9:00 or 10:00 in the morning. (Hemphill Dep. 204.) And Hemphill "seemed to recall" that he had had a discussion with one Black co-

worker, Charles Black, "about the sensitivity of the camera." (*Id.* at 98.) He did not know if Mr. Black made a report to management. (*Id.*) Otherwise, nothing in the record supports Hemphill's claim that he or anyone else reported to HUB that Lytx was discriminating against Black drivers, except Hemphill's own Declaration, filed in support of his opposition to summary judgment, in which he asserts that he "complained to Ty Wright and Ed Foster that [he] was concerned the artificial intelligence in the Lytx camera system may be inadvertently causing racial discrepancies in Idelic Warning List point accruals." (Hemphill Decl. ¶ 8.)[2] He does not actually indicate at which meeting he made this complaint, when it occurred, or whether he is in fact thinking of his meeting in May 2023 with Wright and Smith.

The written record—specifically the lengthy emails from May 14–16, 2023—does not reflect a discussion of race and does not affirmatively establish that Hemphill ever complained to his managers that he believed the Lytx system discriminated based on race. When asked during his deposition what he talked about when he met with Wright and Smith in May 2023 about his issues with Lytx, Hemphill said they discussed the fact that he was being "dinged" for eating and drinking. (Hemphill Dep. 107.) He did not indicate that he complained that he was being dinged by Lytx for eating and drinking because of his race or color.

It is well established that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Smith v. Consol. Rail Corp.*, 91 F.3d 144 (Table), 1996 WL 366283, at *4 (6th Cir. June 28, 1996) (quoting *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)). Even

---

[2] The court presumes, without deciding, that this "vague charge of discrimination" qualifies as protected activity, but it is not clear at all that it does. *Cf. Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) ("Title VII does not protect an employee, however, if his opposition is merely a 'vague charge of discrimination.'" (quoting *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)).

without a direct contradiction, the "sham affidavit" rule "can also apply when the witness's affidavit is in tension with . . . prior testimony as long as the circumstances show that the party filed the affidavit merely to manufacture 'a sham fact issue.'" *Boykin v. Fam. Dollar Stores of Michigan, LLC*, 3 F.4th 832, 842 (6th Cir. 2021) (quoting *Aerel S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006)). At the same time, the rule does not prevent a party "who was not directly questioned about an issue from supplementing incomplete deposition testimony with a sworn affidavit." *Aerel*, 448 F.3d. at 907. Importantly, a deponent "is under no obligation to volunteer information not fairly sought by the questioner." *Id.* A party is free to file a declaration that "fills a gap left open by the moving party and thus provides the district court with more information, rather than less, at the crucial summary judgment stage." *Id.*

In this case, Hemphill's assertion in his Declaration that he complained to Wright and Foster that the "Lytx camera system may be inadvertently causing racial discrepancies in Idelic Warning List point accruals" is in obvious tension with the contemporaneous email exchange that complains about the Lytx system generally but without reference to race and his deposition testimony, stating that what he talked about in meetings with company management was that he was being dinged for eating and drinking. (*Compare* Hemphill Decl. ¶ 8 *with, e.g.*, Hemphill Dep. 107.) However, the court cannot find any instance in Hemphill's deposition where he was directly asked whether he complained to HUB management that he thought Lytx was discriminating unfairly (even if unintentionally) based on race.[3] And Hemphill's statement in his Declaration that he told his managers that he believed Lytx was "causing racial discrepancies" is not in actual conflict with his testimony that they talked about the system's dinging him for eating and drinking.

---

[3] He was asked whether he has "spoken with anybody at Lytx" about his suspicions. (Hemphill Dep. 94.)

Under these circumstances, although it presents an extremely close call, the court does not find it appropriate to invoke the sham affidavit rule. In other words, the court accepts, for purposes of the plaintiff's *prima facie* case of retaliation, that he may have engaged in protected conduct by complaining in some meeting he had with Wright no later than mid-June 2023 that Lytx might discriminate based on race.

HUB also argues that Hemphill cannot show a causal connection between this alleged protected activity and any adverse action for purposes of his *prima facie* case and that, even if he could, he cannot refute the company's legitimate, non-retaliatory reasons for its actions. Hemphill contends that the company retaliated against him by suspending him, causing him to "lose runs," placing him on PDPs, and ultimately terminating him. He maintains that the temporal proximity between his complaints and the adverse actions is sufficiently short to establish causation and that he can establish pretext, because (1) HUB "misclassified the terminating event as an 'accident' rather than an incident"; (2) HUB misrepresented that his PDP did not impact the decision to terminate him; (3) Hemphill was subjected to numerous other incidents of "discipline" when other drivers were not for the same conduct; (4) the plaintiff's three-day "furlough" was a punitive suspension; and (4) HUB's internal emails reflect pretext, specifically a "Hallelujah!" email from Ed Foster to Ty Wright after learning of Hemphill's termination.

As the defendant points out, the plaintiff's first PDP took place *before* Hemphill's alleged complaint that Lytx was racist. The second did not take place until late August, more than two months later (at least), and his termination did not take place until October, more than four months later. As the Sixth Circuit has stated, "a roughly 75-day delay between [a plaintiff's] protected activity and an adverse employment action is not, standing alone, a convincing case for proving causation." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 449 (6th Cir. 2020). The court finds that

the plaintiff cannot establish a causal connection between his purported protected conduct and his PDPs or termination based solely on the timing of the events, and he offers no other evidence of causation.

Regarding his three-day furlough, assuming that this event qualifies as an adverse employment action, the plaintiff cannot show that the defendant's proffered reason for it is pretext for retaliation for protected conduct. Ty Wright sent out a text to "all drivers" on June 12, 2023, notifying them that he had been directed to "sit" drivers "if we are over the daily scheduled threshold," as a result of which many drivers would only be working four days per week, but that the company was "trying to be as fair as possible." (Doc. No. 35-17 at 2.) The plaintiff was notified on June 14 that he would be furloughed under this policy until June 18. (*See* Doc. No. 40-7 at 3.) Wright explained to him that it was Hemphill's "turn to sit" but also that the "decision was made to do it now because of [Hemphill's] driving behavior" and his continuing to argue about the matter. (*Id.*) The plaintiff clearly believed that the action was punitive and "retaliatory" for his complaints *generally*, and he confirmed during his deposition that his assumption was based entirely on Wright's email itself. (*See* Hemphill Dep. 121–22.)

"The plaintiff does not need to prove pretext; [he] only needs to show that the question of pretext is a genuine factual dispute." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 667 (6th Cir. 2020) (citing *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)). "Notably, this burden on the plaintiff 'merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination.'" *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). Thus, on summary judgment, "[i]n evaluating pretext and the plaintiff's ultimate burden, the court should consider all [probative] evidence in the light most

favorable to the plaintiff, including the evidence presented in the *prima facie* stage." *Id.* (quoting *Provenzano*, 663 F.3d at 812). Generally, to establish pretext, the plaintiff must come forward with some evidence from which a reasonable jury could conclude that the defendant's proffered reason had "no basis in fact, did not motivate the adverse employment action, or was insufficient to motivate the action." *Greer v. Cummins, Inc.*, No. 22-5663, 2023 WL 9472037, at *3 (6th Cir. Oct. 23, 2023) (citing *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012)).

With regard to the plaintiff's three-day furlough, he offers no evidence aside from his own speculation that Wright's reason for the action and the timing of it had no basis in fact, did not motivate the decision, or were insufficient. The plaintiff's argumentative tone in his emails on June 14 and June 15, standing alone, is sufficient to justify the timing of Wright's decision to "sit" him, and, in any event, the plaintiff has no evidence that other drivers were treated differently than he was with regard to furloughs.

Even assuming that the plaintiff could establish a causal connection between his protected activity and his second PDP or his termination, he cannot establish that HUB's reasons for those actions was pretext for retaliation. The PDP was based on the points assigned by Idelic, and Hemphill's termination was based on his failure to report an accident, in violation of company policy. That his history with the company and prior PDPs may have contributed to that decision does not conflict with or suggest that the proffered reason—his failure to report the accident—was pretext for retaliation. Although Hemphill now claims that there is some distinction between an "incident" and an "accident," his argument ignores the plain language of HUB policy, quoted above, which requires drivers to report all accidents and incidents immediately to their immediate supervisor. (*See* Doc. No. 35-1 at 11–12, 17–18.) In other words, however the "trailer rub" is characterized, Hemphill was required to report it, and he admitted that he did not report it as

required by HUB policy. He also fails to offer any evidence beyond his rank speculation that Foster's sending a "Hallelujah" email to Wright after the termination was concluded suggests retaliation.

The other events Hemphill complains about are either too trivial to qualify as adverse events or they predated the alleged adverse events. The court finds that the evidence in the record, viewed in the light most favorable to the plaintiff, would not permit a rational jury to find in the plaintiff's favor on his claims of retaliation in violation of § 1981 and the THRA. The defendant is entitled to summary judgment on these claims.

**B. Retaliation Under the FLSA**

FLSA retaliation claims that rely on indirect evidence are also analyzed under the *McDonnell Douglas* framework. *Adair v. Charter Cnty. of Wayn*e, 452 F.3d 482, 489 (6th Cir. 2006). To establish a *prima facie* case of retaliation, the plaintiff must show that "(1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Caudle v. Hard Drive Express, Inc.*, 91 F.4th 1233, 1237–38 (6th Cir. 2024) (quoting *Adair*, 452 F.3d at 489).

The anti-retaliation provision of the FLSA makes it unlawful for an employer to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee." 29 U.S.C. § 215(a)(3). For purposes of a retaliation claim, an employee "engages in protected activity when he opposes employer practices that the employee reasonably believes are in violation of the statute." *Warren v. Chester Cnty.*, No. 25-5370, 2026 WL 372953,

at *5 (6th Cir. Feb. 10, 2026) (quoting *Browning v. Franklin Precision Indus., Inc.*, No. 23-5406, 2023 WL 8437235, at *3 (6th Cir. Dec. 5, 2023)). "To support a retaliation claim, the opposed practice need not actually violate [a statute]; rather, the employee must have 'reasonably believed it to be a violation of [the statute].'" *Bacon v. Honda of Am. Mfg., Inc.*, 192 F. App'x 337, 342-43 (6th Cir. 2006) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) (alterations omitted))). For purposes of the notice element of the *prima facie* case, "a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Warren*, 2026 WL 372953, at *6 (quoting *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011)). "An employee's complaint must take on "some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns." *Id.* (quoting *Kasten*, 563 U.S. at 14). "A complaint has been 'filed' when a reasonable, objective person would understand the employee to have put the employer on notice that she is asserting statutory rights under the FLSA." *McKinnon v. L-3 Commc'ns Corp.*, 814 F. App'x 35, 42 (6th Cir. 2020).

The defendant contends that Hemphill did not engage in protected activity and that his vague complaints about delays in payment were not sufficient to put it on notice that the plaintiff was making a complaint under the FLSA. (Doc. No. 36 at 19; *see also id.* ("Put simply, Hemphill's complaints were trivial in nature – frustration about minor delays in payments of his wages – not clear and detailed complaints that put HUB Group on notice that they were potentially violating his rights under the FLSA.").) Hemphill responds that he "repeatedly complained . . . that he was not being paid correctly or promptly for work already performed" and that he had to "'repeatedly address' those pay problems." (Doc. No. 39 at 19.)

As set forth above, Hemphill testified that he was always paid at least minimum wage, that he never complained to HUB management that he did not receive at least minimum wage, and he did not "recall" whether he ever complained about not receiving overtime pay. (Hemphill Dep. 166.) Instead, he claimed that his pay was delayed on several occasions. (*See id.* at 167 ("Not never paid, delayed.").) He offers no evidence that he made any type of complaint that would have put HUB on notice that he believed his rights under the FLSA were being violated. As a result, he cannot establish that he engaged in activity protected by the FLSA or that HUB was on notice of such protected activity.

HUB is entitled to summary judgment on Hemphill's FLSA retaliation claim.

### C. Unjust Enrichment

To prevail on an unjust enrichment claim under Tennessee law, a plaintiff must demonstrate the following elements:

> (1) there must be no existing, enforceable contract between the parties covering the same subject matter; (2) the party seeking recovery must prove that it provided valuable goods and services; (3) the party to be charged must have received the goods and services; (4) the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated; and (5) the circumstances must also demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them.

*College v. Nat'l Ass'n of Christian Athletes*, No. E2021-00931-COA-R3-CV, 2023 WL 128275, at *6 (Tenn. Ct. App. Jan. 9, 2023) (quoting *Smith v. Hi-Speed, Inc.*, 536 S.W.3d 458, 480 (Tenn. Ct. App. 2016)).

HUB asserts that it is entitled to summary judgment on this claim because Hemphill cannot show that he rendered services for which he was not paid. (Doc. No. 36 at 22 (citing Hemphill Dep. 167–70).) The plaintiff responds that "a reasonable jury could conclude that Hub Group was unjustly enriched by retaining the benefit of Plaintiff's services while mishandling or delaying wages and cutting remunerative tasks in response to his complaints." (Doc. No. 39 at 23.)

Hemphill does not, however, point to evidence in the record giving rise to a material factual dispute as to whether he performed any work for which he was not paid. When he was asked during his deposition whether it was his "understanding that [he was] never paid for some of [his] routes," Hemphill clarified, "Not never paid, delayed." (Hemphill Dep. 167.) Asked to confirm that he was always ultimately paid for the routes he drove, Hemphill stated that he believed that "there were significant pay disparities" but that he just "got tired of checking [his] income statements every week." (Hemphill Dep. 167–68.) However, he could not identify any workweek for which he was not paid for all of the hours he worked. Discovery has been completed, and Hemphill has not produced or identified any evidence suggesting that he was not paid for all hours worked. (*Id.* at 169–70.) Hemphill's speculation or belief that he may not have been paid for all of the hours he worked is not sufficient to permit a rational jury to conclude that he, in fact, worked hours for which he was not paid. Moreover, his statement in his Declaration that Denise Smith, when she was his supervisor, "consistently underpaid [him] for work performed" (Hemphill Decl. ¶ 12) directly contradicts the plaintiff's deposition testimony that his pay was simply "delayed" at times and that he could not identify any work performed for which he was not ultimately paid. As such, it is subject to the sham affidavit rule and will not be accepted as creating a material factual dispute.

HUB is entitled to summary judgment on the plaintiff's unjust enrichment claim.

## V. CONCLUSION

The plaintiff concedes that he cannot prevail on his substantive claims under 42 U.S.C. § 1981, the THRA, and the FLSA, and he fails to establish a material factual dispute that would preclude summary judgment as to his retaliation and unjust enrichment claims. HUB's Motion for Summary Judgment (Doc. No. 34), therefore, will be granted, and this case will be dismissed. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge